IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

OCA – GREATER HOUSTON, et al.,

    Plaintiffs,

    v.

STATE OF TEXAS, et al.,

    Defendants.

CIVIL ACTION NO. 1:15-cv-00679-RP

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

I.   INTRODUCTION ................................................................................................. 1

II.  STATEMENT OF THE CASE............................................................................. 4

    A.  The Undisputed Facts of State Defendants Conduct ...................................4

    B.  The Undisputed Facts Regarding Plaintiff Das ...........................................5

    C.  The Undisputed Facts Regarding Plaintiff OCA-GH ..................................7

III. SUMMARY JUDGMENT STANDARD ............................................................. 9

IV. STATEMENT OF THE ISSUES ....................................................................... 10

V.  ARGUMENT ..................................................................................................... 10

    A.  Enforcement of the Texas Election Code in a manner that restricts voter
        choice of an interpreter based on the prospective interpreter's registration
        status constitutes a violation of Section 208 as a matter of law................................10

        1.   Section 208 of the VRA broadly secures the right to a chosen assistor
            throughout the voting process.................................................................10

        2.   The Texas Election Code is not consistent with Section 208 of the VRA. ...........11

        3.   The Texas Election Code, as enforced by State Defendants, places
            restrictions on voter choice of an assistor beyond those found in Section
            208 of the VRA.......................................................................................12

        4.   State Defendants promote and enforce the Texas Election Code in an
            impermissible manner that restricts the voter's choice of an interpreter
            based on the prospective interpreter's registration. ..............................14

    B.  Ms. Das has standing to bring the present claims against State Defendants. ..............14

    C.  OCA-GH has organizational standing. .......................................................15

    D.  The award of a reasonable attorney's fee would not be unjust....................19

VI. CONCLUSION................................................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)................................................................................................9

*Charles H. Wesley Educ. Found., Inc. v. Cox*,
  408 F.3d 1349 (11th Cir. 2005) ...........................................................................18

*Crawford v. Marion County Election Bd.*,
  472 F.3d 949 (7th Cir. 2007) ...............................................................................18

*Defense Distributed v. United States Dep't of State*,
  121 F. Supp. 3d 680, 697 (W.D. Tex. 2015)........................................................14

*Fla. State Conf. of the NAACP v. Browning*,
  522 F.3d 1153 (11th Cir. Fla. 2008) ...............................................................16, 18

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*,
  528 U.S. 167, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000)................................16, 18

*Hanrahan v. Hampton*,
  446 U.S. 754 (1980)..............................................................................................19

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982).......................................................................................16, 18

*Hensley v. Eckerhart*,
  461 U.S. 424 (1983)..............................................................................................19

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)..........................14, 15, 16

*Mississippi State Chapter, Operation Push v. Allain*,
  674 F.Supp. 1245 (N.D. Miss. 1987)....................................................................18

*N.A.A.C.P v. City of Kyle, Tex.*,
  626 F.3d 233 (5th Cir. 2010) ..........................................................................15, 16

*Newman v. Piggie Park Enterprises, Inc.*
  390 U.S. 400 (1968)..............................................................................................19

*Reynolds v. Sims*,
  377 U.S. 533 (1964)................................................................................................1

*United States v. Berks County,*
   250 F. Supp. 2d 525 (E.D. Pa. 2003) ...................................................................2, 3, 11, 14

*Veasey v. Perry,*
   29 F. Supp. 3d 896, 902-04 (S.D. Tex. 2014) .................................................................18

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.,*
   429 U.S. 252, 97 S. Ct. 555, 50 L. Ed. 2d 450 (1977) ....................................................14

*Wallace v. Tex. Tech Univ.,*
   80 F. 3d 1042 (5th Cir. 1996) .........................................................................................15

*Warth v. Seldin,*
   422 U. S. 490, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975) .................................................15

**Statutes**

42 U.S.C. § 1983 ..................................................................................................................1, 4

42 U. S. C. § 1988 .....................................................................................................................19

52 U.S.C. § 10310(e) ................................................................................................................19

52 U.S.C. § 10503 ..................................................................................................................1, 2

52 U.S.C. § 10508 .............................................................................................................1, 2, 10

Tex. Elec. Code §§ 61.031-61.036 ...........................................................................................12

Tex. Elec. Code §§ 64.031-64.035 ...........................................................................................11

Tex. Elec. Code § 64.0321 ........................................................................................................11

**Other Authorities**

Federal Rule of Civil Procedure 56(c) ........................................................................................9

S. Rep. No. 94-1011 (1976) ......................................................................................................19

S. Rep. No. 97-417 (1982) .....................................................................................................1, 10

I.      INTRODUCTION

Plaintiffs respectfully move for summary judgment in favor of their claims against State Defendants under Section 208 of the Voting Rights Act of 1965 (the "VRA"), 52 U.S.C. § 10508 (formerly 42 U.S.C. § 1973aa-6), and 42 U.S.C. § 1983 ("Section 1983").  As demonstrated by the following discussion, there is no dispute as to the *material* facts in the case, and Plaintiffs are undoubtedly entitled to judgment as a matter of law.

The right to vote is undoubtedly a fundamental concern in a free and democratic society. *Reynolds v. Sims*, 377 U.S. 533, 561-562 (1964).  To be sure, "the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights." *Id*.  The VRA has been a stalwart shield of potentially disenfranchised U.S. citizens at the polls for over 50 years.  Its original and sustained purpose is to "banish the blight of racial discrimination in voting" by overcoming legal barriers erected at the state and local levels of government that would otherwise inhibit full participation for all Americans in the fundamental democratic process of voting.  Ex. A (S. Rep. No. 97-417 (1982)) at 4 and 107.

In 1975, Congress expanded the VRA's original scope of protection to embrace Limited English Proficient (LEP) citizens by including the language assistance provisions of Section 203. *See* 52 U.S.C. § 10503.  The provisions of Section 203 were intended to address discriminatory practices by state and local governments that effectively excluded citizens of "language minorities" (*i.e.*, persons who are American Indian, Asian American, Alaskan Natives, or of Spanish heritage) from participation in the electoral process.  *See id*.  Section 203 requires the availability of bilingual voting materials (*i.e.,* registration or voting notices, forms, instructions, assistance, or other materials or information relating to the electoral process, including ballots) in state or political subdivisions having a threshold amount of LEP voters (*e.g.*, more than 5% or

more than 10,000 voting-age citizens of a single language minority).  *See id*.  In 1982, Congress fortified the VRA by extending the provisions of Section 203 for an additional seven years and supplementing the protection of LEP voters with the addition of the general voter assistance provision of Section 208.  *See*, *e.g.*, Ex. A at 1; *see also* 52 U.S.C.A. § 10508.  Section 208 was meant to ensure that blind or disabled persons or those unable to read or write in English (*e.g.*, LEP citizens) could receive voting assistance from a person of their own choosing.  Ex. A at 2, 57; *see also* Ex. B (A Citizen's Guide to Understanding the Voting Rights Act) at 6 ("This law covers those unable to read or write due to illiteracy or due to their lack of fluency in the English language (*e.g.*, members of minority language groups).").  Unlike Section 203, the provision of Section 208 applies nationwide, not merely in certain qualifying jurisdictions.  Thus, Section 208 fills a substantial gap in the VRA's protection of LEP citizens, specifically in situations where the qualifying thresholds of Section 203 are not met, and English-only voting materials are permitted.

The addition of Section 208 was based on Congressional findings that LEP citizens are more susceptible to having their votes unduly influenced or manipulated, and thus are more likely to be discriminated against at the polls.  Ex. A at 62.  Indeed, "[c]ertain discrete groups of citizens are unable to exercise their rights to vote without obtaining assistance in voting including and within the voting booth."  *Id*.; *see also United States v. Berks County*, 250 F. Supp. 2d 525, 527 (E.D. Pa. 2003) ("Voting without understanding the ballot is like attending a concert without being able to hear."[1])  Regarding the manner of providing such assistance, Congress stressed the importance of establishing the voter's freedom of choice in selecting an assistor, noting "voters

---

[1] "Even if the voter, illiterate in English, may be able to distinguish one candidate's last name from another, the voter illiterate in English may not understand the office for which the various candidates are running, and surely cannot understand the various propositions, ranging from bond authorizations to constitutional amendments."

may feel apprehensive about casting a ballot in the presence of, or may be misled by, someone other than a person of their own choice." Ex. A at 62.  Thus, Congress concluded that the right to an assistor of the voter's choice is "the ***only way*** to assure meaningful voting assistance and to avoid possible intimidation or manipulation of the voter." *Id.* (emphasis added).  As such, "any State restriction on who is allowed to assist the voter is [not] valid." Ex. B at 6.  Moreover, similar to the language of its sister provisions at Section 203, the right to voter assistance under Section 208 is unquestionably secured at every stage of the voting process, from registration through casting a ballot.  Thus, a state law "[cannot] deny the assistance at some stages of the voting processing during which assistance [is] needed." Ex. A at 57; *see also* Ex. B at 55 ("Section 208 . . . allows voters who are illiterate, blind or disabled to receive assistance in registering to vote and in voting[.]").

While Section 208 serves an important role in securing suffrage for LEP voters, it is a minimally invasive provision from the standpoint of the state and local governments.  This federal law imposes no standards on the quality of assistance, nor does it impose significant obligations on governments to ensure meaningful access to voting.  Indeed, the costs of implementing Section 208 are borne almost entirely by the voter and the chosen assistor.  To comply with Section 208, states and local governments are merely asked to properly train election officials to step aside while voters in need of assistance exercise their right to it.  State Defendants, however, have not stepped aside, and are, in fact, actively erecting an obstacle to the right to assistance secured by the VRA's Section 208.  Accordingly, this action seeks injunctive relief directing State Defendants and all persons acting in concert with them to cease and desist all conduct that denies voters who qualify for assistance under Section 208 an interpreter of their choice based on the interpreter's county of residence.  *See* Dkt. 14 at ¶ 4.

There is no doubt that State Defendants actively facilitate and encourage enforcement of the Texas Election Code in a manner that contradicts Section 208 by restricting the voter's choice of an interpreter to persons registered to vote in the same county.  As such, there are no material facts in dispute as to whether State Defendants' conduct constitutes a violation of Section 208. Therefore, Plaintiffs serve and file this motion for Summary Judgment requesting this court to grant Plaintiffs' Request for Relief set forth in the Amended Complaint.

## II.    STATEMENT OF THE CASE

On August 6, 2015, Plaintiffs filed a complaint in the United States District Court for the Western District of Texas asserting related claims against State Defendants under Section 208 of the VRA and 42 U.S.C. § 1983.  Shortly thereafter, on August 27, 2015, State Defendants moved to dismiss Plaintiffs' claims, arguing chiefly that (1) Texas law comports with Section 208; and (2) Plaintiff OCA-Greater Houston ("OCA-GH") lacks standing to bring suit.  On September 21, 2015, Plaintiffs duly filed a memo in opposition to State Defendants' motion to dismiss together with an amended complaint providing additional factual allegations against State Defendants. State Defendants again moved to dismiss Plaintiffs' claims on October 5, 2015, and Plaintiffs promptly filed another memo in opposition to the renewed motion on October 19, 2015.  After considering a reply brief filed by State Defendants' on October 26, 2015, this Court issued an order on December 3, 2015 denying the motion to dismiss and preserving each of Plaintiffs' claims against State Defendants.  In the order, the Court concluded that "the Interpretation Provisions, insofar as they restrict voter choice of interpreter, flatly contradict Section 208."  Dkt. 27 at 7.

### A.    The Undisputed Facts of State Defendants Conduct

Undisputed evidence establishes that State Defendants promote and enforce portions of the Texas Election Code, particularly Section 61.033 (the "Interpretation Provision"), in a manner that restricts the voter's choice of an interpreter based on the prospective interpreter's registration

status.  More specifically, State Defendants urge an application of Section 61.033 that restricts voter choice of an interpreter to only those persons who are registered to vote in the same county. The State's conduct can be seen in the following list of exhibits that are self-authenticating as official publications under Federal Rule of Evidence 902(5):

- Instructions to enforce rules in violation of Section 208 are set forth on the Texas Secretary of State ("SOS") Elections Division website under "VOTERS WITH SPECIAL NEEDS" and "WHO, WHAT, WHERE, WHEN, HOW."  The website instructs voting officials to only permit interpreters that are registered within their own county to assist voters.  Ex. C at 2; Ex. D at 1.

- The Handbook for Election Judges and Clerks instructs election officials to violate Section 208 with regard to the choice of interpreters – *see* Section on "Using English Interpreters."  Ex. E (2014) at 34; Ex. F (2016) at 34.

- The Poll Watcher's Guide states that "any registered voter of the county may act as an interpreter for one or more voters."  Ex. G at 17.

Subject matter jurisdiction and personal jurisdiction are also undisputed in this case.  In fact, a personal jurisdiction defense was not raised by motion or asserted in State Defendants' Answer (*see* Dkt. 29 at 8), and has therefore been waived under Fed. R. Civ. P. 12(b)(h)(1).  A subject matter jurisdiction defense, while not waivable, has appropriately *not* been raised by State Defendants because the asserted VRA and Section 1983 claims undoubtedly invoke federal questions.

### B.    The Undisputed Facts Regarding Plaintiff Das

Ms. Das is a registered voter of Williamson County, residing in Round Rock.  *See* Ex. H (Deposition Transcript of Saurabh Das) at 6:18-7:3, 20:16-24; *see also* Ex. I (voter registration

confirmation of Mallika Das via the SOS website) at 1.  On October 31, 2014, Ms. Das attempted to vote with the assistance of her son, Saurabh Das, at a Williamson County poll site in Round Rock.  *See* Ex. H at 9:18-25, 25:12-22.

Ms. Das was born in India and moved to the United States sometime between 1995 and 1996.  *See* Ex. H at 5:16-20.  Ms. Das speaks Bengali, and is a person of limited English proficiency.  *See* Ex. H at 5:12-25, 13:15-19.

At the request of Ms. Das, Saurabh Das intended to assist his mother in voting by performing translating services that she indicated were needed to understand the ballot.  *See* Ex. H at 10:18-21, 22:19-23:11.  Saurabh is the only family member of Ms. Das residing in either Travis or Williamson County, other than Mr. Das, who also expressed a need for translating services.  *See* Ex. H at 8:17-9:11, 14:10-19, 16:23-25.

Upon arrival at the Williamson County poll site, Saurabh indicated to a poll worker that he intended to translate for his mother, Ms. Das.  *See* Ex. H at 13:6-8 ("A. I remember saying that my mother needs a translator and herself asked and that I would be translating because we speak the same language[.]").  At the request of the poll worker, Saurabh declared that he was registered to vote in Travis County.  *See* Ex. H at 13:8-10 ("A. ... and he asked me where I was registered to vote and I said Travis County.").  In accordance with the local and state training guides, the poll worker indicated that Saurabh could not perform translating services because he was registered to vote outside of Williamson County.  *See* Ex. H at 13:11-14 ("A.  . . . I think he then went to look something up or read something and he said well, you have to reside in the county where your mother lives and be registered to vote there in order for you to be a translator."); *see also id*. at 14:5-9.

Ms. Das proceeded to cast a ballot without the translating assistance of Saurabh.  *See* Ex. H at 15:7-9, 16:6-8.  Saurabh observed Ms. Das as she operated the voting machines to cast her ballot and noted that she appeared uncomfortable and confused.  *See* Ex. H at 15:16-20.  After rejoining Saurabh, Ms. Das indicated this was indeed the case.  *See* Ex. H at 16:9-17 ("Q. What did she tell you? A. That she was very confused and she doesn't really know if she voted correctly. . . [and] that she wished she had me with her to translate[.]").

### C.      The Undisputed Facts Regarding Plaintiff OCA-GH

Plaintiff Organization of Chinese Americans – Greater Houston is a not-for-profit organization.  *See* Ex. J at 1; Ex. K at 1; Ex. L at 1.  OCA-GH is dedicated to the national organization's mission of "advancing the social, political, and economic well-being of Asian Pacific Americans[.]"  Ex. M at 1; *see also* Ex. N at 9:13-15 ("Q. Okay.  What is OCA-Greater Houston's mission?  A. Our mission is the same as the OCA-National's mission.").  One of the four main goals of OCA-GH's mission is "to promote civic participation, education, and leadership."  Ex. K at 1; Ex. L at 1.

The "Get out the Vote" (GOTV) initiative is a core part of OCA-GH's mission to promote civic participation among Asian Americans.  *See* Ex. N (Deposition Transcript of Debbie Chen) at 6:9-19, 40:20-24, 41:3-42:11; *see also* Ex. O at 1; Ex. P at 5 ("OCA-GH also partnered with APIAVote on getting out the vote efforts such as voter registration & education, [and] phone banking[.] . . . The OCA-GH GOTV team made 3000+ phone calls[.]"); Ex. Q at 9; Ex. R at 2. The GOTV initiative is centered on encouraging OCA-GH community members to register and pledge to vote.  *Id.*  A major part of that effort is educating community members on how to vote, so that they can do so effectively.  *Id.*  The primary GOTV activities are in-person outreach and phone banking.  *Id.*; *see also* Ex. N at 14:25-17:9.

OCA-GH perceives a detrimental effect of the Texas Election Code's Interpretation Provisions on the community membership it serves.  *See* Ex. N at 73:20-24 ("Q. Have you heard or has anybody complained to you or to OCA that they took somebody with them to help them vote and they weren't permitted to have that person help them vote? A. Yes."), 75:4-14, 77:1-15, 81:25-82:22, 85:6-24; Ex. S at 16 (several Asian American voters, when surveyed, reported problems with improper requests for identification, rude or hostile poll workers, and lack of language access), *id.* at 20 (OCA is listed as a national co-sponsor of the AALDEF Exit Poll Report).  OCA-GH attempts to resolve this perceived detrimental effect through its various GOTV activities, such as in-person outreach and phone banking.  *See* Ex. N at 45:24-47-12, 41:13-42:4, 47:22-48:14, 48:21-49:15, 59:15-62:21; *see also* Ex. P at 5; Ex. T at 1; Ex. R at 2.

OCA-GH has limited available financial resources to dedicate towards the GOTV initiative.  *See*, *e.g.*, Ex. N at 32:19-25 ("Q.  . . . [W]hat's your 2016 budget for Get Out The Vote, projected?  A. I hope our budget will be 20,000, which is what our budget was last year[.]"), 33:12-22, 91:21-25 ("[A.] I mean, I know earlier we were talking about $20,000 doesn't sound like a lot of money and, yea – Q. It goes quickly, though."); Ex. U at 1-2 ("APAIVote will grant a total of $20,000 in two installments to OCA-Greater Houston.").  OCA-GH also has limited available volunteer resources or "manpower" to dedicate towards the GOTV initiative.  *See*, *e.g.*, Ex. N at 28:10:24 ("I say "manpower" very specifically because we are majority, you know, throughout our history, volunteer run. . . We're very subject to, you know, our volunteer manpower"), 29:10-14, 38:22-24.  Addressing the Assistance and Interpretation provisions as part of GOTV consumes both financial and volunteer resources.  *See*, *e.g.*, Ex. N at 89:21-93:16, 94:13-97:2, 102:2-103:11 ("And that's you know, a very you know, concrete example of how it, you know, costs us in terms of resources, you know, extra volunteer and manhours.").

OCA-GH believes that other aspects of GOTV could be expanded if in-person outreach and phone banking could be run leaner.  *See*, *e.g.*, Ex. N at 94:13-17 ("So, if I'm having to spend extra money to, you know, hire people to offset, you know, the volunteer time, the manhours that we have, that is, you know, an expenditure of funds that we're diverting, right, from – we could have sent out more mailers.").  Moreover, OCA-GH believes that addressing the Interpretation Provisions diminishes the effectiveness of in-person outreach and phone banking.  *See*, *e.g.*, Ex. N at 38:22-39:11 ("But it does, you know, potentially impact the amount of time and the number of people we're able to – to impact because I still have a finite amount of volunteers to work with.").

## III.   SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law."  The summary judgment movant has the initial burden of "'showing' that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).  Once that has been done, Rule 56 "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.  The nonmovant cannot rely on the mere allegations of its pleadings.   Rather, the nonmovant must use affidavits, depositions, answers to interrogatories, or admissions to "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 325.  In the case at bar, discovery has generated no dispute as to material facts; therefore, summary judgment is appropriate.  Fed.R.Civ.P. 56(c).

IV.     STATEMENT OF THE ISSUES

Does enforcement of the Texas Election Code in a manner that restricts the voter's choice of an interpreter based on the prospective interpreter's registration status constitute a violation of Section 208?  If so, do State Defendants promote and enforce the Texas Election Code in such a manner?  And, is there at least one plaintiff who has demonstrated standing to assert the claims for relief set forth in the Amended Complaint?

V.      ARGUMENT

   A.     **Enforcement of the Texas Election Code in a manner that restricts voter choice of an interpreter based on the prospective interpreter's registration status constitutes a violation of Section 208 as a matter of law.**

      1.     **Section 208 of the VRA broadly secures the right to a chosen assistor throughout the voting process.**

Section 208 of the VRA, 52 U.S.C. § 10508 broadly secures the right of LEP voters to obtain assistance to vote by a person of their choice, other than the voter's employer or union, or agents thereof.  State Defendants have vigorously argued that "assistance to vote" under Section 208 is limited only to ballot box activities.  This Court, however, has noted that such an interpretation is "implausible when contrasted with the context of the VRA and its amendments." Dkt. 27 at 6 (citing S. Rep. No. 97-417, at 5).  Indeed, it is entirely nonsensical "that Congress enabled assistance in the unsupervised ballot box by 'a person whom the voter trusts and who cannot intimidate him' but envisioned no rule for the person the voter trusts when the voter enters the polling station, communicates with election officers, and fills out the requisite forms." *Id.*  The fallacy of State Defendants' interpretation is abundantly clear when applied in context of the present case.  Here, enforcement of the Texas Election Code according to State Defendants' interpretation severely cripples the rights secured by Section 208.  In particular, State Defendants' interpretation restricts the LEP voter's choice of an assistor intended to serve as an interpreter

outside of the ballot box to a significantly smaller subset of trusted individuals than are permitted to serve in the same role within it (*see* discussion below regarding the Assistance and Interpretation Provisions).  Surely, Congress did not intend for the protections of Section 208 to have such a blatant vulnerability.  To the contrary, the clear intent of Congress was to fortify, and therefore make fully meaningful, the right to vote against the consequences of state law, noting that state provisions cannot "deny the assistance at some stages of the voting process during which assistance [is] needed."  Ex. A at 62-63.  Indeed, the proposition that Section 208 rights extend beyond the ballot box is supported by multiple authorities over the years.  *See e.g.*, Ex. B at 59 ("[S]ection 208 [] allows voters . . . to receive assistance in registering to vote *and* in voting from virtually any person whom the voter chooses."); *see also Berks County*, 250 F. Supp. 2d at 527 ("[T]he meaningful right to vote extends beyond the immediate four corners of the voting machine.").

    **2.**       **The Texas Election Code is not consistent with Section 208 of the VRA.**

Unlike Section 208, which broadly secures the right to a chosen assistor throughout the voting process in a single provision, the Texas Election Code provides two distinct subchapters that govern the self-procured assistance to which LEP voters are entitled to avail themselves – namely, Subchapter B of Chapters 61 and 64, respectively.

Chapter 64 permits a voter in need of assistance in marking the ballot may select a person of their choice to do so other than the voter's employee or union, or agents thereof.  *See* Tex. Elec. Code §§ 64.031-64.035 (the "Assistance Provisions").  Assisting a voter under the Assistance Provisions is expressly defined to at least include "reading the ballot to the voter;" directing the voter to read the ballot;" "marking the voter's ballot;" or "directing the voter to mark the ballot." *Id*. at § 64.0321.

Chapter 61 permits a voter to communicate with an election officer through an interpreter of the voter's choice. *See id.* at §§ 61.031-61.036 (the "Interpretation Provisions"). The chosen interpreter is permitted to accompany and serve the voter in the ballot box if the voter cannot comprehend the language in which the ballot is printed. *Id.* at § 61.034. Thus, in circumstances involving LEP voters, the duties of a chosen interpreter overlap with those of a chosen assistor at least inside the ballot box. Though unlike the Assistance Provisions, the Interpretation Provisions require that, "[t]o be eligible to serve as an interpreter, a person must be a registered voter of a county in which the voter needing the interpreter resides." *Id.* at § 61.033.

### 3. The Texas Election Code, as enforced by State Defendants, places restrictions on voter choice of an assistor beyond those found in Section 208 of the VRA.

All parties and the Court agree that the Assistance Provisions do not place restrictions on voter choice beyond those found in the VRA. *See, e.g.*, Dkt. 21 at 10-12; Dkt. 27 at 5. All parties and the Court also agree, however, that the Interpretation Provisions *__do__* place restrictions beyond those found in Section 208 insofar as they are enforced to limit voter choice of an interpreter to persons registered to vote in the same county. *See, e.g.*, Dkt. 21 at 12-14; Dkt. 27 at 5. Accordingly, this Court has very clearly stated (Dkt. 27 at 7):

> In short, the State Defendants get the VRA wrong. The Assistance Provisions, insofar as they honor the VRA's requirement of voter choice only at the ballot box, are insufficient to implement Section 208. And the Interpretation Provisions, insofar as they restrict voter choice of interpreter, flatly contradict Section 208. Making meaningful the right to vote does not begin or end at the ballot box. Voters must, at a minimum, have the capacity to navigate polling stations and communicate with election officers notwithstanding blindness, disability, or limited language proficiency. They must be able to understand and fill out any required forms, and to understand and to answer any questions directed at them by election officers. And they must be able to do so with the assistance of "a person whom [they] trust[] and who cannot intimidate [them]." *Id.* at 62.
>
> Accordingly, the Texas Election Code Interpretation Provisions, § 61.031 – 61.036, restrict voter choice in a manner inconsistent with the Federal Voting Rights Act.

Having established that Section 208 is not limited to ballot box activities, not only is State Defendants' present enforcement of the Texas Election Code inconsistent with the VRA, it also contradicts a previous administrative action by the Secretary of State's own office.  Indeed, in 1984, The Office of the Secretary of State adopted TAC §81.113 as an emergency measure "to obtain compliance with federal law and uniformity in the application of federal law in Texas elections[.]" Ex. V (Texas Register, Volume 9, February 28, 1984) at 1181.  Under this emergency provision, the Secretary of State confirmed that "a voter entitled to assistance may choose any person not disqualified by the Federal Voting Rights Act, §208, as his assistant notwithstanding . . . the residence of the person chosen; . . . [or] the voter registration status of the person chosen." *Id.*

    **4.**    **State Defendants promote and enforce the Texas Election Code in an impermissible manner that restricts the voter's choice of an interpreter based on the prospective interpreter's registration.**

Not only have State Defendants failed to ensure that voters who are unable to read the ballot receive voting assistance from a person of their choice, which may alone constitute a violation of Section 208[2], they have erected a staunch barrier to such assistance – an undeniable violation of the VRA.  In fact, the uncontroverted evidence presented above establishes this.

    **B.**    **Ms. Das has standing to bring the present claims against State Defendants.**

State Defendants have argued in their various motions to dismiss that Plaintiff OCA-GH has suffered no injury, and therefore lacks standing to sue.  As discussed below, these arguments are flawed, but they are also irrelevant as Ms. Das has no such standing issues and only one plaintiff is required for a judgment in favor of Plaintiffs. Indeed, this Court has previously observed that "[l]ack of standing by one plaintiff is not dispositive." *Defense Distributed v. United States Dep't of State*, 121 F. Supp. 3d 680, 697 (W.D. Tex. 2015) (citing *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264, 97 S. Ct. 555, 50 L. Ed. 2d 450 (1977)).  Thus, the more fact intensive questions regarding the organizational standing of OCA-GH can be set aside for the purposes of this Motion, because Ms. Das has undoubtedly demonstrated standing to assert the present claims.

*Lujan* requires a plaintiff to show that he or she has suffered an injury in fact that is fairly traceable to the challenged acts of the defendant and that is likely to be redressed by a favorable judicial decision.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 119

---

[2]    *See Berks County*, 250 F. Supp. 2d at 533-34, where the court issued a preliminary injunction based on a likelihood that Plaintiff-DOJ would prevail on a Section 208 claim against Defendant-Berks County in spite of the uncontroverted fact that poll officials were issued a form noting that "Assistant NEED NOT be from the same voting precinct[.]"

L. Ed. 2d 351 (1992).   An injury sufficient to satisfy Article III must be "concrete and particularized" and "actual or imminent, not 'conjectural' or 'hypothetical.'" *Lujan* at 560.

The undisputed facts presented above demonstrate that the *Lujan* requirements are met with respect to Ms. Das.  Ms. Das undoubtedly suffered a concrete and particularized injury when she was denied the right to obtain needed voting assistance by a person of her choice – Saurabh Das. As this Court has correctly concluded, there is a "reasonable likelihood" that Ms. Das will again be subject to harm "[i]nsofar as the law remains in force and Defendants continue to urge the application of that law."  Dkt. 27 at 9 (citing *Wallace v. Tex. Tech Univ.*, 80 F. 3d 1042, 1047 n.3 (5th Cir. 1996).).  The harm to Ms. Das is directly traceable to State Defendants' promulgation and enforcement of the Interpretation Provisions, and would be redressed by a favorable decision in this case.  While State Defendants may argue that the harm to Ms. Das has already been alleviated by a settlement agreement between Plaintiffs and Williamson County, this is not so. Indeed, the settlement agreement is entirely contingent upon the outcome of this very case.  *See* Ex. W (Williamson County Settlement Agreement) at 4.  If judgment is rendered in the State's favor, the County can resume its violations of the VRA (and likely *would* in view of the State's guidance to do so).

### C.      OCA-GH has organizational standing.

While Ms. Das's standing is sufficient on its own, there can be no reasonable dispute that OCA-GH also has independent standing.  To have standing, "an association or organization must satisfy the well-known requirements of *Lujan*."  *N.A.A.C.P v. City of Kyle, Tex.*, 626 F.3d 233, 237 (5th Cir. 2010).  The injury-in-fact requirement helps to ensure that the plaintiff has a "personal stake in the outcome of the controversy."  *Warth v. Seldin*, 422 U. S. 490, 498, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975) (internal quotation marks omitted).  Thus, an organization has standing to

sue on its own behalf insofar as it has suffered injury in fact.  *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

Generally, standing requires only a minimal showing of injury.  *See e.g.*, *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 180-84, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000).  Indeed, the Supreme Court in *Lujan* confirmed that even the mere desire to observe an animal species for purely esthetic purposes is "undeniably a cognizable interest for purposes of standing." *Lujan,* 504 U.S. at 562-563.

State Defendants' arguments that OCA-GH has suffered no such injury are based on the misapplication of a case line involving organizational plaintiffs devoting resources to advance legal endeavors pursuant to the Fair Housing Act.  The organizations in *Havens*, *ACORN* and *NAACP* were litigation-focused entities, and the rationale supporting these decisions merely clarifies that the allegations and evidence required to demonstrate an injury in fact cannot be "self-inflicted."  That is, there is a general prohibition against bootstrapping the cost of detecting and challenging illegal practices into injury for standing purposes.  *Fla. State Conf. of the NAACP v. Browning*, 522 F.3d 1153, 1166 (11th Cir. Fla. 2008).  Generally speaking, the resources dedicated by the organizations in those FHA cases were spent litigating the very claim at issue in the suit.

However, OCA-GH has <u>not</u> even asserted the expenditure of resources to support this or any other litigation as an injury in fact.  The harmful effects of the law on OCA-GH have nothing to do with the costs of litigating this case or lobbying to change Texas law.  *See*, *e.g.*, Ex. N at 88:12-15 ("Q. [W]hat kind of efforts has OCA – like lobbying-type efforts has OCA undertaken regarding the interpreter provision in Texas law?  A. None."); *cf. N.A.A.C.P v. City of Kyle*, 626 F.3d at 236, 238 (stating "[t]he *HBA* is a lobbying group," and noting that HBA failed to demonstrate how various "prelitigation" endeavors and lobbying proved an injury in fact).

Rather, OCA-GH specifically points to resources expended on the arduous endeavor of educating their members and others about the requirements of the Texas Election Code's Interpretation Provisions, which undoubtedly frustrates OCA-GH's mission to promote civic participation among Asian Americans.  The undisputed facts presented above show that OCA-GH is aware of the detrimental effect of the assister/interpreter issue on its community membership, and has spent its limited resources to address this problem by educating its members on how to deal with poll workers by specifying that your helper is an "assistor" not an "interpreter" or "translator."  As a practical matter, the Assistance and Interpretation provisions are difficult to explain to prospective voters – particularly those that do not speak English proficiently – and therefore are an encumbrance to certain efforts by OCA-GH that are part of GOTV – namely in-person outreach and phone banking.  Addressing the counter intuitive Assistance and Interpretation provisions significantly drains the limited resources and mitigates the effectiveness of the OCA-GH GOTV initiative.

Indeed, OCA-GH relies mostly on volunteers for GOTV work, but they also pay "independent contractors" by the hour.  So, time alone is a valuable resource with respect to volunteers, and it translates directly to money with respect to paid workers.  Other aspects of GOTV could be expanded (*e.g.*, the mailers sent out to registered voters) if the conversational outreach could be run more lean.  Moreover, the assister/interpreter issue complicates the voting registration "sales pitch" during conversational outreach activities (*e.g.*, phone banking and in-person discussions).  This decreases the effectiveness of GOTV from two perspectives.  First, fewer community members are impacted by OCA-GH, because each worker spends more of their limited time per member.  Second, the complexity of the issue becomes a deterrent to voting at all.

LEP voters are particularly vulnerable to intimidation at the polls, and they may fear that poll workers will not allow them to receive help from the person they bring with them.

This is precisely the kind of harm to nonprofit organizations that various other courts have deemed sufficient to support standing in cases pursuant to the VRA and other federal voting rights statutes. *See e.g.*, *Veasey v. Perry*, 29 F. Supp. 3d 896, 902-04 (S.D. Tex. 2014) (citing *Havens*, "[i]n situations where a violation of individuals' rights will cause a drain on the resources of an association committed to the individuals'' rights, the association has stated a case or controversy sufficient to confer standing on the association."); *Crawford v. Marion County Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007) (citing *Havens*, "the new law injures the Democratic Party by compelling the party to devote resources to getting to the polls those of its supporters who would otherwise be discouraged by the new law from bothering to vote"; and citing *Friends of Earth*, "[t]he fact that the added cost has not been estimated and may be slight does not affect standing, which requires only a minimal showing of injury."); *Fla. State Conf. of the NAACP v. Browning*, 522 F.3d 1153 (11th Cir. Fla. 2008) (evidence demonstrating the diversion of personnel and time to educating volunteers and voters on compliance with state voter registration statute is sufficient to show a concrete injury); *Mississippi State Chapter, Operation Push v. Allain,* 674 F.Supp. 1245, 1261 (N.D. Miss. 1987) (citing *Havens*, "[i]nasmuch as the plaintiffs have shown that the challenged statutes . . . burden their organizational efforts to assist prospective voters in registering, the court finds that all of the plaintiffs have standing to sue. . . ."); *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1353-54 (11th Cir. 2005) (an organization conducting voter registration has a protected interest under the VRA in having individuals it registers be processed properly, and a state's actions negatively impacting that interest confer standing on the organization to bring suit on its own behalf).

**D.      The award of a reasonable attorney's fee would not be unjust.**

Title 42 U. S. C. § 1988 provides that in federal civil rights actions "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."  The language of 52 U.S.C. § 10310(e) (formerly 42 U.S.C. § 19731(e)) recites similar language.[3]  The express purpose of these discretionary fee-shifting provisions is to overcome the "American Rule" that each party in a lawsuit ordinarily shall bear its own attorney's fees.  *See Hensley v. Eckerhart*, 461 U.S. at 429.  As stated by the Supreme Court in *Hensley*:

> "The purpose of § 1988 is to ensure 'effective access to the judicial process' for persons with civil rights grievances. H. R. Rep. No. 94-1558, p. 1 (1976). Accordingly, a prevailing plaintiff "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." S. Rep. No. 94-1011, p. 4 (1976) (quoting *Newman v. Piggie Park Enterprises*, Inc., 390 U.S. 400, 402 (1968))."

As the record in this case reflects no such special circumstances, the customary reasonable attorney's fee award is appropriate at the discretion of the Court as a matter of law.

**VI.     CONCLUSION**

For at least the foregoing reasons, Plaintiffs request the Court to find in favor of this Motion for Summary Judgment, enter a judgment in favor of Plaintiffs, and award all relief requested the Plaintiffs' Amended Complaint.

---

[3]   "[The] provision for counsel fees in § 1988 was patterned upon the attorney's fees provisions contained in Titles II and VII of the Civil Rights Act of 1964, 42 U. S. C. §§ 2000a-3(b) and 2000e-5(k), and § 402 of the Voting Rights Act Amendments of 1975, 42 U. S. C. § 1973l(e)." *Hanrahan v. Hampton*, 446 U.S. 754, 758, n. 4 (1980) (per curiam).  Indeed, the legislative history of § 1988 indicates that Congress intended that "the standards for awarding fees be generally the same as under the fee provisions of the 1964 Civil Rights Act."  *Hensley v. Eckerhart*, 461 U.S. 424, 433 n. 7 (1983) (citing S. Rep. No. 94-1011, p. 4 (1976)).

Dated: April 22, 2016

Respectfully submitted,

**FISH & RICHARDSON P.C.**

By: */s/ David M. Hoffman*
David M. Hoffman
Texas Bar No. 24046084
hoffman@fr.com
Kenneth W. Darby
Texas Bar No. 24097570
kdarby@fr.com
One Congress Plaza, Suite 810
111 Congress Avenue
Austin, TX 78701
Telephone: 512-472-5070
Facsimile: 512-320-8935

**Asian American Legal Defense and
Education Fund ("AALDEF")**

Jerry Vattamala*
99 Hudson Street, 12th Floor
New York, NY 10013
Telephone: 212.966.5932
Facsimile: 212.966.4303
jvattamala@aaldef.org

**ATTORNEYS FOR PLAINTIFFS
OCA – GREATER HOUSTON and
MALLIKA DAS**

* Admitted Pro Hac Vice

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing document has been electronically filed on April 22, 2016, and served on opposing counsel who are registered as filing users of the CM/ECF system pursuant to Local Rule 5(b)(1).

By: */s/ David M. Hoffman*
David M. Hoffman