IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| OCA–GREATER HOUSTON, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | 1:15-CV-00679-RP |
| | § | |
| STATE OF TEXAS, et al., | § | |
| | § | |
| Defendants. | § | |

**ORDER**

Before the Court are Plaintiffs' Motion for Summary Judgment (Dkt. 44), Defendants'

Motion for Summary Judgment (Dkt. 45), and the responsive pleadings thereto. After considering

the pleadings, the relevant law, and the factual record, the Court issues the following Order.

**<u>BACKGROUND</u>**

The late Mallika Das ("Ms. Das") was born in India and moved to the United States in the

mid-1990s. (Dkt. 44-9, at 5). She was an American citizen and a registered voter of Williamson

County, Texas. (Dkt. 44-1, at 6). On October 31, 2014, she went to vote in Williamson County.

Because she is limited-English proficient and has found it difficult to vote in the past, she brought

her son, Saurabh Das ("Saurabh" or "Mr. Das"), to assist her. (Decl. of Saurabh Das, Dkt. 44-9, at

12).

At the polling station, Mr. Das told the poll official his mother needed a translator and that

he was at the polling station to interpret. (Declaration of Saurabh Das, Dkt. 44-9, at 13) ("I

remember saying that my mother needs a translator and she herself asked and that I would be

translating because we speak the same language."). The poll official then asked whether Mr. Das was

a registered voter in Williamson County. (*Id.*). Mr. Das answered truthfully that he was not—he is

registered to vote in neighboring Travis County. (*Id.*). The poll officials "had a discussion amongst

themselves" and "decided relatively quickly that they wouldn't allow [him] to translate." (*Id.* at 26–27). According to the poll official, Mr. Das could not translate for his mother because he was not registered to vote in Williamson County. (*Id.* at 13). Ms. Das proceeded to vote without Mr. Das's assistance. Ms. Das passed away in the late stages of this litigation. (Dkt. 54).

The Organization of Chinese Americans ("OCA") – Greater Houston is a not-for-profit organization dedicated to the national organization's mission of "advancing the social, political, and economic well-being of Asian Pacific Americans." (*See, e.g.*, Dkts. 44-11, 44-12, 44-13, 44-14). One of the primary missions of the organization is to promote civic participation and to provide civic education. (*See, e.g.*, 44-12 at 1). One of OCA–Greater Houston's core projects is its "Get out the Vote" initiative ("GOTV"), which encourages voting and educates members on how to vote. (Dep. Tr. of Debbie Chen, Dkt. 44-15, at 6:9–19, 41:3–42:11).

Ms. Das and OCA–Greater Houston brought two related causes of action against the State of Texas and Texas Secretary of State Carlos Cascos in his official capacity ("the State Defendants").[1] First, Plaintiffs argue that the State Defendants violate Section 208 of the federal Voting Rights Act by restricting voters' choice of interpreter. (Pls.' Am. Compl., Dkt. 14, ¶¶ 33, 34). Second, Plaintiffs argue that the State's violation deprives them of "rights and privileges" such that Defendant Cascos is liable under 42 U.S.C. § 1983. (*Id.* ¶ 40.)

The parties have filed motions for summary judgment. (Dkts. 44, 45). Plaintiffs argue Defendants "facilitate and encourage enforcement of the Texas Election Code [("TEC")] in a manner that contradicts [the Voting Rights Act] by restricting the voter's choice of an interpreter to persons registered to vote in the same county." (Pls.' Mot. Summ. J., Dkt. 44, at 4). Defendants argue that the TEC comports with the Voting Rights Act, and that it was Williamson County

---

[1] Plaintiffs also named Williamson County and the Williamson County Elections Department ("the local government entities"). However, the local government entities settled and the Court—at the urging of the parties—dismissed with prejudice Plaintiffs' claims against them. (*See* Order of Dismissal, Dkt. 42).

election officials, not the State or state actors, that wrongfully deprived Ms. Das of the assistance to which she was entitled under the Act. (*E.g.*, Defs.' Mot. Summ. J., Dkt. 45, at 10).

On August 8, 2016, after the parties had briefed the issues, the Court held an evidentiary hearing on Plaintiff OCA–Greater Houston's standing. The motions for summary judgment are ripe for determination.

## STANDARD OF REVIEW

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure only "if the movant shows there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986).

The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Court will view the summary judgment evidence in the light most favorable to the non-movant. *Rosado v. Deters*, 5 F.3d 119, 123 (5th Cir. 1993). Once the movant carries its burden, the burden shifts to the nonmoving party to establish the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986); *Wise v. E.I. Dupont de Nemours & Co.,* 58 F.3d 193, 195 (5th Cir. 1995). The non-movant must respond to the motion by setting forth particular facts indicating that there is a genuine issue for trial. *Miss. River Basin Alliance v. Westphal*, 230 F.3d 170, 174 (5th Cir. 2000). The parties may satisfy their respective burdens by tendering depositions, affidavits, and other competent evidence. *Topalian v. Ehrman,* 954 F.2d 1125, 1131 (5th Cir. 1992). "After the non-movant has been given the opportunity to raise a genuine

factual issue, if no reasonable juror could find for the non-movant, summary judgment will be granted." *Westphal*, 230 F. 3d at 174.

In this case, all parties have moved for summary judgment. Indeed, all parties rely on substantially the same evidentiary bases in making their case for judgment without trial. The dispute is not over the facts, but over the legal significance of those facts.

## ANALYSIS

Plaintiffs allege that Defendants promulgated and enforce laws that violate the Voting Rights Act ("VRA"). Specifically, Section 208 of the VRA provides that:

> Any voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union.

52 U.S.C.A. § 10508 (formerly 42 U.S.C.A. § 1973aa-6). Unlike other provisions of the VRA which are discussed *infra*, Section 208 does not impose an affirmative obligation on states. It operates instead as a negative obligation—states must not limit voters' right to assistance by a person of their choice.

Two chapters of the TEC govern the assistance offered to limited-English proficient voters. Chapter 64 allows a voter to use an "assistor" of the voter's choice. Tex. Elec. Code § 64.031–64.035 ("Assistance Provisions"). Chapter 61 allows a voter to use an "interpreter" of the voter's choice. *Id.* § 61.031–61.036 ("Interpretation Provisions").

The Assistance Provisions allow assistance "in marking the ballot" if the voter cannot "prepare the ballot" by reason of physical disability or "an inability to read the language in which the ballot is written." Tex. Elec. Code. § 64.031. Assistance is limited to "reading the ballot to the voter," "directing the voter to read the ballot," "marking the voter's ballot," or "directing the voter to mark the ballot." *Id.* § 64.0321. Assistance "occurs while the person is in the presence of the

voter's ballot or carrier envelope." *Id.* In other words, assistance occurs inside the ballot box, and in no event outside of the ballot box.

The Interpretation Provisions do not apply to blind or otherwise disabled voters. The Interpretation Provisions require election officers to communicate only in English when "performing an official duty in connection with the election." *Id.* § 61.031(a). If a voter cannot communicate in English, the "election officer may communicate with the voter in a language that the voter and officer understand." *Id.* § 61.031(b).  And if the officer does not speak the same language as the voter, "the voter may communicate through an interpreter selected by the voter." *Id.* § 61.032. If one may act as an interpreter, they may "accompany the voter to the voting station for the purpose of translating the ballot to the voter." *Id.* § 61.034.  An interpreter, unlike an assistor, "must be a registered voter of the county in which the voter needing the interpreter resides." *Id.* § 61.033.

The State Defendants argue that the Assistance Provisions—which allow a voter assistance by the person of their choice *in the ballot box*—codify the full scope of the right afforded by Section 208. Plaintiffs argue that ballot box assistance is not enough and that, if both the Assistance and Interpretation Provisions are necessary to protect the full scope of the right afforded by Section 208, the Interpretation Provisions' additional requirements violate federal law.

a.   *Standing*

Federal courts possess jurisdiction over only those disputes that constitute cases or controversies. *Raines v. Byrd*, 521 U.S. 811, 818 (1997). The Supreme Court has articulated three requirements for a justiciable case or controversy.

> First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized; and (b) 'actual or imminent, not "conjectural" or "hypothetical."' Second, there must be a causal connection between the injury and the conduct complained of— the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third

party not before the court.' Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'

*N.A.A.C.P. v. City of Kyle*, 626 F.3d 233, 237 (5th Cir. 2010) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)) (alterations in original).

### i. Ms. Das Standing

The State Defendants argue Ms. Das lacks standing to assert her VRA claims against them. (Defs.' Mot. Summ. J., Dkt. 45, at 8). Ms. Das passed away since the parties briefed their motions for summary judgment. (Dkt. 54). The parties do not suggest that her cause of action survives her death. *See, e.g.*, *Ex parte Schrieber*, 110 U.S. 76, 80 (1884). Accordingly, the Court proceeds to assess OCA–Greater Houston's standing.

### ii. OCA–Greater Houston Standing

The State Defendants argue that OCA–Greater Houston lacks standing to sue. OCA–Greater Houston bases its standing on so-called "organizational standing." Like an individual, an organization has standing to sue on its own behalf if it has suffered injury in fact. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). To have standing, "an association or organization must satisfy the well-known requirements of *Lujan*." *City of Kyle*, 626 F.3d at 237.

In *Havens Realty Corp. v. Coleman*, the Supreme Court addressed the question of organizational standing where an organization—Housing Opportunities Made Equal ("HOME")—alleged it "ha[d] been frustrated by defendants' racial steering practices in its effort to assist equal access to housing through counseling and other referral services." 455 U.S. at 379. The Court stated that if defendants' practices "perceptibly impaired HOME's ability to provide counseling and referral services for low- and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact." *Id.* Organizations do not have carte blanche to sue when they are frustrated by state or local rules: As the Fifth Circuit has emphasized, "not every diversion of resources to counteract the defendant's conduct . . . establishes an injury in fact." *City of Kyle*, 626

F.3d at 238. For example, an organization cannot claim the costs of litigating an alleged violation as the predicate injury for standing to litigate that violation. *Id.* In order to have standing, an organization's injury must be concrete—not conjectural—and "perceptibl[e]." *Havens Realty Corp.*, 455 U.S. at 379.

The State Defendants argue first that OCA–Greater Houston has not suffered injury because,"[a]t most, educating voters on assistance under Texas election laws poses an inconvenient distraction to staff and volunteers on site to help educate voters." (Defs.' Mot. Summ. J., Dkt. 45, at 12). Defendants argue second that OCA–Greater Houston's injury is not caused by Defendants because "[t]he only concrete injury alleged in this matter is the result of the independent action of a third party based on guidance that conflicted with Texas law." (*Id.* at 14). Defendants argue finally that OCA–Greater Houston's injury is not redressable because the "Secretary of State has no enforcement authority over the counties with respect to the assistor – interpreter provisions." (*Id.*). The Court addresses each argument in turn.

The first question is whether the Texas laws have concretely and perceptibly frustrated OCA–Greater Houston's ability to assist its members.

Defendants argue they have not, and rely primarily on *N.A.A.C.P. v. Kyle* to challenge OCA–Greater Houston's standing. In that case, the National Association for the Advancement of Colored People ("NAACP") and that organization's state and local branches sued Kyle, Texas for alleged violations of the Fair Housing Act ("FHA"). 626 F.3d at 236. The NAACP claimed that the city's revised zoning and subdivision ordinances "have caused the price of entry-level, single-family residences to increase," thereby "disparately impact[ing] African-Americans and Hispanics by making new homes unaffordable to more African-American and Hispanic households than to Caucasian households." *Id.* Standing "r[o]se or f[e]ll" depending on *organizational* injury, which the NAACP claimed to be its "prelitigation" responses to the revised ordinances: "a $15,000 study on

the impact of the revised ordinances and lobbying 'to get the City to back down on the Revised

Ordinances.'" *Id.* at 238. The Fifth Circuit denied standing:

> Plaintiffs have not explained how the activities described above, which
> basically boil down to examining and communicating about developments in
> local zoning and subdivision ordinances, differ from [their] routine lobbying
> activities. Furthermore, Plaintiffs have not identified any specific projects
> that [they] had to put on hold or otherwise curtail in order to respond to the
> revised ordinances.

*Id.* at 238–39. Echoing the language in *Kyle*, Defendants argue that "OCA has never exhausted its

annual grant . . .[;] no other projects (gala dinner, film festival, book talks, etc.) have been negatively

impacted." (Defs.' Mot. Summ. J., Dkt. 45, at 12) (internal citations omitted). In short, Defendants

argue, "educating voters on assistance under Texas election laws poses an inconvenient distraction

to staff and volunteers already on site to help educate voters." (*Id.*).

 *Kyle* informs but does not determine this Court's analysis. First, it is distinguishable: unlike

the plaintiffs in *Kyle*, OCA–Greater Houston does not claim the costs of litigating this action or

lobbying to change the law to be its injuries. (Dkt. 45-3, at 88:12–15).[2] Also unlike the plaintiffs in

*Kyle*, OCA–Greater Houston is not a litigation-focused entity whose primary mission is to advocate

for or challenge laws. *Compare Kyle*, 626 F. 3d at 238 (stating plaintiffs failed to explain how

prelitigation and lobbying efforts differ from routine lobbying efforts) *with Havens Realty Corp., 455

U.S.* at 379 (finding standing based on a frustration of efforts to assist equal access to housing

"through counseling and other referral services"). Second, *Kyle* does not, as Defendants seem to

argue, enhance the showing required for organizational standing above the showing required for

individual standing. *See Kyle*, 626 F. 3d at 237 (stating that, to have standing, "an association or

organization must satisfy the well-known requirements of *Lujan*"). Nor does this Court read *Kyle* to

require organizational plaintiffs to show "specific projects that [they] had to put on hold or

otherwise curtail[ed] in order to respond to the [challenged laws]." *Id.* at 238–29. Such exhaustion of

---

[2] "Q. [W]hat kind of efforts has OCA – like lobbying – type efforts has OCA undertaken regarding the interpreter provision in Texas law? A. None." (Dkt. 45-3, at 88:12–15).

organizational resources would be probative of a concrete and particularized injury.[3] But it is not *necessary* to a showing of concrete and particularized injury. The Fifth Circuit is clear that Article III's injury requirement is "qualitative, not quantitative, in nature." *Ass'n of Comty. Orgs. for Reform Now v. Fowler*, 178 F. 3d 350, 357–58 (5th Cir. 1999). And the Supreme Court has "expressly rejected" the argument that "the injury in fact requirement was limited to 'significant[]' injuries." *Id.* at 358 (quoting *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n. 14 (1973)).

Two additional lines of precedent inform this Court's analysis. First, recent Fifth Circuit precedent holds that the diversion of organizational resources from voter registration and other get-out-the-vote initiatives toward education concerning compliance with voting regulations confers standing. In *Veasey v. Abbott*, the Fifth Circuit reviewed a challenge to Texas Senate Bill 14 ("S.B. 14"), which "began requiring voters to present certain specific forms of identification at the polls." 796 F. 3d 487, 494 (5th Cir. 2015), *reh'g granted*, 815 F. 3d 958 (5th Cir. 2016). After noting that "Article III standing cannot be waived or assumed," the Fifth Circuit found that "most of the private, political, and organizational plaintiffs ha[d] standing." *Id.* at 497. According to the district court, those Plaintiffs with standing included the League of United Latin American Citizens ("LULAC"), Texas State Conferences of NAACP Branches, the Mexican American Legislative Caucus of the Texas House of Representatives ("MALC"), and La Union Del Pueblo Entero, Inc. ("LUPE"), among others. *See Veasey v. Perry*, 71 F. Supp. 3d 627, 633 (S.D. Tex. 2014). LULAC had standing because it "will have to divert resources away from other activities such as registering new voters to," among other things, "educate already-registered members about  S.B. 14's requirements," *Veasey v. Perry*, 29 F. Supp. 3d 896, 903 (S.D. Tex. 2014); the NAACP had standing because it had "to divert its resources from its ordinary voter registration and get-out-the-vote efforts to educating

---

[3] This language in *Kyle* echoed another fair housing case involving another litigation-based entity, *Louisiana ACORN Fair Housing v. LeBlanc*, 211 F. 3d 298, 305–06 (5th Cir. 2000). In that case, too, the 5th Circuit considered such a showing would be probative of a "concrete and particularized injury as required by *Lujan.*" *Id.* at 305.

its members about the S.B. 14 photo identification requirement and assisting voters to cast ballots in compliance with its requirements," *id.*; MALC had standing because it had to "divert its resources to educating citizens about the photo identification requirement and assisting already registered voters in casting ballots in compliance with the new law," *id.*; and LUPE had standing because it had to "divert its resources to educating its members and the larger public on the photo identification requirements in order to minimize the number of registered voters who will be prevented from voting by the new requirements," *id.* En banc, the Fifth Circuit did not disturb the lower court and original panel's ruling on standing. *Veasey v. Abbott*, -- F. 3d --, 2016 WL 3923868, at *3 n.8 (5th Cir. July 20, 2016) (en banc).

Second, the Supreme Court has held organizations to have standing when they are caused by a law to devote resources toward engaging, educating, or encouraging voters to participate. In *Crawford v. Marion Cty. Election Bd.*, the Seventh Circuit held that "organizations such as the Democratic Party" had standing to challenge an Indiana voting law that required voters to present a government-issued photo ID at the polling place. 472 F. 3d 949, 951 (7th Cir. 2007). Writing for the Court, Judge Posner cited evidence that most voters without a photo ID are "low on the economic ladder and thus, if they do vote, are more likely to vote for Democratic than Republican candidates." *Id.* As a result, "the new law injure[d] the Democratic Party by compelling the party to devote resources to getting to the polls those of its supporters who would otherwise be discouraged by the new law from bothering to vote." *Id.* On review, the Supreme Court "agree[d] with the unanimous view of [the Seventh Circuit] judges that the Democrats ha[d] standing." *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 189 n.7 (2008). This was the case even though the Seventh Circuit had said that "the added cost ha[d] not been estimated and may be slight." *Crawford*, 472 F. 3d at 951(citing, among other cases, *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–84 (2000)).

The Court finds that OCA–Greater Houston has suggested and shown injury as required by Article III. Like the organizational plaintiffs in *Veasey* and the Democratic Party in *Crawford*, OCA–Greater Houston engages in voter outreach and civic education; it is a not-for-profit organization dedicated to the national organization's mission of "advancing the social, political, and economic well-being of Asian Pacific Americans." (*See, e.g.*, Dkts. 44-11, 44-12, 44-13, 44-14). One of the primary missions of the organization is to promote civic participation and to provide civic education, (*see, e.g.*, 44-12 at 1), and one of its core projects is its GOTV initiative, which encourages and educates members on how to vote. (Dkt. 44-15, at 6:9 – 19, 41:3 – 42:11).

A substantial portion of the community OCA–Greater Houston serves consists of language minorities, (Dkt. 44-20, at 14), and the organization has witnessed the effect the Assistance and Interpretation Provisions have had on some members of that community. For example, Deborah Chen, a longtime OCA–Greater Houston member and volunteer, testified at the Court's evidentiary hearing on standing to meeting an elderly Asian-American voter who did not vote because she was not allowed the help of the assistor of her choice. (*See also* Dep. Tr. Deborah Chen, Dkt. 44-15, at 73:20–74:5) ("Q: Have you heard or has anybody complained to you or to OCA that they took somebody with them to help them vote and they weren't permitted to have that person help them vote? A: Yes . . . ."); (*id.* at 75:4–14, 77:1–15, 81:25–82:22).

Like the organizational plaintiffs in *Veasey*, OCA–Greater Houston responds to the effects of the Texas laws by calibrating its GOTV education activities. (*See, e.g., id.* at 45:24–47:12).[4] Through outreach and education, the organization attempts to arm the community it serves with the knowledge it needs to assert its right to an assistor. And unlike the plaintiffs in *Kyle*, OCA–Greater Houston has shown that the Texas laws have caused a concrete and perceptible diversion of resources. The organization argues that educating voters about the differences between the

---

[4] "So . . . we had to spend all this time to explain, 'Okay, be very' . . . clear and specific to say that, you know, if you want, you know, this help, that it means assisting and not translating." (*See, e.g.*, Dkt. 44-15 at 45:24–47:12).

Assistance and Interpretation Provisions—differences which are difficult even for the English-speaking attorneys litigating this case[5]—poses a challenge for OCA–Greater Houston's employees and volunteers. (Dkt. 45-3, 45:24–46:24). When OCA–Greater Houston employees and volunteers speak to voters, they must explain, "if you're going to bring someone to . . . help you, then . . . be sure that . . . you understand there's a difference between an assistant versus . . . a translator." (Dkt. 45-3, 45:24–46:24).  That explanation is taxing, because "in Chinese, at least . . . a lot of times people will just think, 'Oh, well, that means assist.' What—what action is 'help'? They think that this person is just coming to translate for them." (*Id.* at 46:14–15). "[B]e very—'very'—be very, you know, clear and specific to say that . . .  if you want . . . this help, that it means assisting and not translating because, you know, if you say 'translating,' then they may not let you bring, you know, whoever you've brought because, you know, your granddaughter is underage, she, you know, isn't registered to vote or for whatever reason." (Dkt. 45-3 at 46:17–24).

The Texas laws cause OCA–Greater Houston to take such additional measures. Though Ms. Das's standing is not at issue here, her experience in Williamson County is illustrative of why the particular words matter, and why OCA–Greater Houston must spend additional time with limited-English voters. Ms. Das asked her son to accompany her to the polling station to help her vote. She and her son remained together at the polling station until they communicated with the poll official. (*E.g.*, Decl. of Saurabh Das, Dkt. 44-9, at 10). Mr. Das expressed to the poll official that "my mother needs a translator." (*Id.* at 13). The poll official took Mr. Das to mean he hoped to accompany his mother as an *interpreter* and applied the requirements of the Interpretation Provisions to him. Mr. Das, who was registered to vote in Travis County, was not permitted to assist his mother in the

---

[5] In their motion for summary judgment, the State Defendants stake the position that the Assistance and Interpretation Provisions govern separate domains: the Assistance Provisions govern the domain inside the ballot box, while the Interpretation Provisions govern the domain outside the ballot box. (*See, e.g.*, Defs.' Mot. Summ. J., Dkt. 45, at 15, 18 n.10) ("[T]he Secretary of State has taken, and will continue to take, the position that once the interpreter wishes to enter the voting booth, the interpreter must also qualify as, and take the oath of, an assistor under Chapter 64."). The Interpretation Provisions, however, very clearly allow an "interpreter" to "accompany the voter to the voting station for the purpose of translating the ballot to the voter." Tex. Elec. Code. § 61.034.

voting booth. The State Defendants contend that the poll official—and not Texas law—is to blame; when Mr. Das said "[he] would be translating because we speak the same language," the poll official should have understood he accompanied his mother as an *assistor* and applied the requirements of the Assistance Provisions to him. But the poll official did not clearly err. It is reasonable, given that Mr. Das represented he was there to "translate," to treat him as an interpreter. *See Taniguchi v. Kan Pacific Saipan, Ltd.*, 132 S. Ct. 1997, 2002 (2012) (aggregating definitions of "interpreter"); BLACK'S LAW DICTIONARY 954, 953 (rev. 4th Ed. 1968) (defining "to interpret" as "to translate orally from one tongue to another").

Clarifying voters' misunderstandings, and educating them to communicate with poll workers about which of the Texas laws they are invoking (and, if necessary, correcting miscommunications with poll workers) takes time. (Dkt. 45-3 at 46:17–24). Ms. Chen, who has both overseen and participated in OCA–Greater Houston's phone banking in the past, testified at the Court's evidentiary hearing on standing that helping voters to navigate the Interpretation and Assistance Provisions of Texas law requires a substantial additional expenditure of volunteer time; in her estimate, a conversation that might otherwise take five minutes takes ten to fifteen minutes. The estimate is consistent with her deposition testimony that the Texas laws double or triple the amount of time spent with each limited – English proficient voter. (Dkt. 45-3 at 90:16–22).[6]

Though Article III injury need not be quantified by a dollar figure, time is valuable. OCA– Greater Houston pays "independent contractors" by the hour. (Dkt. 44-15 at 96:1 – 97:2 (noting that about $6,000 – $7,000 of the GOTV budget was devoted to paying independent contractors)). And Volunteer time is one of OCA–Greater Houston's most valuable resources. Of the estimated $20,000 budget for the organization's GOTV initiative, the majority is spent on printing and

---

[6] Defendants correctly point out that Ms. Chen's estimates do not quantify the additional expense of time OCA–Greater Houston diverts toward addressing the Texas laws. However, as the Court stated *supra*, the Fifth Circuit is clear that Article III's injury requirement is "qualitative, not quantitative," *Fowler*, 178 F. 3d at 358, and is not limited to "'significant[]' injuries." *Id.*

postage; only the remainder is used for phone banking, food, and supplies for volunteers. (Dkt. 45-3, at 38:8–21). "[OCA–Greater Houston is] having to hire people to . . . compensate, essentially, for the extra time it takes." (*Id.* at 91:1–10). Hiring new people means diverting resources—"we could have sent out more mailers. We could have spent more time doing, you know, phone banking," (*id.* at 94:13 – 95:2). The diversion "means something has to give." (*Id.*).

Finally, like the organizations in *Veasey* and the Democratic Party in *Crawford*, the Texas laws injure OCA–Greater Houston by compelling the organization to devote resources to getting to the polls those "who would otherwise be discouraged by the new law from bothering to vote." *Crawford*, 472 F. 3d at 951. OCA must explain to qualified voters, "yes, it's really important for you to go vote, but here are the barriers that you might . . . come against when . . . you actually show up to vote." (*Id.* at 93:2–93:5). In addition to informing voters about the Texas requirements, the organization must motivate community members to vote despite the reality that they may ultimately be forbidden the assistance of their family member or confidant. OCA–Greater Houston has shown injury by the Texas laws. It has standing to challenge their validity.

Defendants next argue that OCA–Greater Houston's injury is not caused by Defendants because "[t]he only concrete injury alleged in this matter is the result of the independent action of a third party based on guidance that conflicted with Texas law." (Defs.' Mot. Summ. J., Dkt. 45, at 14). They argue finally that OCA–Greater Houston's injury is not redressable because the "Secretary of State has no enforcement authority over the counties with respect to the assistor – interpreter provisions." (*Id.*). With regard to the remaining requirements for standing, OCA–Greater Houston has shown injury by the State Defendants that may be redressed by the relief sought. Though the Eleventh Amendment bars suits by private citizens against a state in federal court, *see Hutto v. Finney*, 437 U.S. 678, 700 (1978), "few rules are without exceptions, and the exception to this rule allows suits against state officials for the purpose of enjoining the enforcement of an unconstitutional state

14

statute."[7] *Okpalobi v. Foster*, 244 F.3d 405, 411 (5th Cir. 2001). To sue a state official for the purpose of enjoining the enforcement of a state statute, Plaintiffs need to show only that "the named defendant state officials have *some connection with the enforcement of the act* and 'threaten and are about to commence proceedings' to enforce the unconstitutional act. *Okpalobi*, 244 F.3d at 416 (emphasis in original) (quoting *Ex Parte Young*, 209 U.S. 123, 155–56 (1908)). Plaintiffs have shown the State Defendants have some connection with the enforcement of the Assistance and Interpreter Provisions. Defendant Cascos is "the chief election officer of the state." TEX. ELEC. CODE § 31.001. *Cf. Harkless v. Brunner*, 545 F. 3d 445, 451 (6th Cir. 2008) (finding that the Secretary of State, as "chief State election official," was properly named defendant in a suit under the National Voter Registration Act). As the chief election officer, he is responsible for "obtain[ing] and maintain[ing] uniformity in the application, operation, and interpretation of [the Texas Election Code] and of the election laws outside th[e] Code." TEX. ELEC. CODE § 31.003. As part of that obligation, he must "prepare detailed and comprehensive written directives and instructions relating to and based on [the Texas Election Code] and the election laws outside th[e] code." *Id.* He must also "assist and advise all election authorities with regard to the application, operation, and interpretation of [the Texas Elections Code] and of the election laws outside th[e] code." *Id.* § 31.004. In other words, OCA–Greater Houston has shown its injury is caused by the subject laws and that its injury can be redressed by the relief requested.

      Finding each element required for standing, the Court proceeds to assess the merits of OCA–Greater Houston's claims.

### b. The Texas Election Code and the Voting Rights Act

      The question at the heart of this case is whether Section 208 of the VRA, which guarantees certain voters assistance to vote by the person of their choice, is confined to the ballot-box activities

---

[7] "This exception rests on the fiction of *Ex parte Young*—that because a sovereign state cannot commit an unconstitutional act, a state official enforcing an unconstitutional act is not acting for the sovereign state and therefore is not protected by the Eleventh Amendment." *Okpalobi*, 244 F.3d at 411.

of reading and marking the ballot, or covers polling place activities beyond the ballot box. The question appears to be a novel one.

"The appropriate starting point when interpreting any statute is its plain meaning." *Sample v. Morrison*, 406 F. 3d 310, 312 (5th Cir. 2005). Section 208 of the VRA provides that:

> Any voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union.

52 U.S.C.A. § 10508 (formerly 42 U.S.C.A. § 1973aa-6). The first step is to determine whether the language at issue has a "plain and unambiguous meaning with regard to the particular dispute in the case." *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 450 (2002) (citing *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)).

The text of the provision does not resolve the particular dispute in the case, because the parties disagree on the scope of what it means "to vote." Defendants contend the verb is narrow— referring to reading and marking the ballot inside the ballot box. Plaintiffs offer a broader definition that treats voting as a process, minimally encompassing voters' interactions with poll workers at a polling place.

When a statute is subject to differing interpretations, the Court examines "its legislative history, predecessor statutes, pertinent court decisions, and post-enactment administrative interpretations." *Salazar v. Maimon*, 750 F. 3d 514, 518 (5th Cir. 2014) (quoting *Rogers v. San Antonio*, 392 F. 3d 758, 761 (5th Cir. 2004)) (internal quotation marks omitted). Accordingly, the Court looks not only to the text of Section 208, but to the VRA generally: its legislative history, predecessor statutes, and pertinent judicial interpretations.

i.       *A Brief History of the VRA and its Amendments*

"Inspired to action by the civil rights movement," Congress passed the VRA in 1965 to correct its century-long failure to enforce the right to vote guaranteed by the post – Civil War

Fifteenth Amendment. *Shelby Cty v. Holder*, 133 S. Ct. 2612, 2619 (2013). Piecemeal Fifteenth Amendment litigation had been impotent against states' tools of disenfranchisement; "[t]he heart of the [VRA] [was] a complex scheme of stringent remedies aimed at areas where voting discrimination ha[d] been most flagrant." *State of S.C. v. Katzenbach*, 383 U.S. 301, 315 (1966) *abrogated on other grounds by Shelby Cty.*, 133 S.Ct. In addition to other methods of disenfranchisement—like whites-only primaries and gerrymandering—Congress was concerned with the practice, "beginning in 1890," of states using "tests . . . specifically designed to prevent Negroes from voting." *Id.* at 312. "Typically, [states] made the ability to read and write a registration qualification and also required completion of a registration form." *Id.* These "literacy" laws were based on the fact that, in 1890, "more than two-thirds of the adult Negroes were illiterate while less than one-quarter of the adult whites were unable to read or write." *Id.*

Subsequent enactments and extensions of the VRA addressed barriers to voting that the original Act did not. In 1975, Congress found that "citizens of language minorities have been effectively excluded from participation in the electoral process" and declared it necessary to prohibit certain exclusionary practices and prescribe additional remedial measures. 52 U.S.C. § 10503. Congress amended the definition of forbidden "tests or devices" to include the practice of providing English-only voting materials. *See Shelby Cty.*, 133 S.Ct. at 2620.  The new language-assistance provision— Section 203—required certain "covered States and political subdivisions"[8] to provide "voting notices, forms, instructions, assistance, or other materials or information relating to the electoral process, including ballots," in the language of the applicable minority group as well as in the English language. *Id.* § 10503(c).

---

[8] A "covered division" is one where, for example, "more than 5 percent of the citizens of voting age of such State or political subdivision are members of a single language minority and are limited-English proficient" or "more than 10,000 of the citizens of voting age . . . are members of a single language minority and are limited-English proficient." 52 U.S.C. §§ 10503(b)(2)(A)(i)(I), 10503(b)(2)(A)(i)(II).

In 1982, Congress reauthorized the VRA for an additional 25 years. In so doing, it additionally found that "[c]ertain discrete groups of citizens are unable to exercise their rights to vote without obtaining assistance in voting including and within the voting booth." (S. Rep. 97-417 (1982), available at Dkt. 44-2, at 5). To remedy such disenfranchisement, Congress added the provision at issue in this case, Section 208. Section 208 gives voters who are unable to read or write English the right to be assisted by persons of their choice. 52 U.S.C. § 10508. The goal is to afford blind, disabled, and limited-English proficient voters "the same opportunity to vote enjoyed by all citizens." (S. Rep. 97-417 (1982), available at Dkt. 44-2, at 5).

It is this provision, within the larger context of the VRA and its amendments, that the Court must interpret.

### ii.    The Scope of Section 208

The VRA recognizes time and again that "the 'right to vote' means more than the mechanics of marking a ballot or pulling a lever." *United States v. Berks County*, 250 F. Supp. 2d 525, 536 (E. D. Pa. 2003). To be sure, making meaningful the guarantee of equal opportunity to vote includes, as Defendants cite, "bring[ing] into the voting booth a person whom the voter trusts and who cannot intimidate him." (S. Rep. 97-417 (1982), available at Dkt. 44-2, at 5). But the right "includes" the voting booth; it does not exclude all else. *Id.* In adding Section 208, Congress recognized that voting is a *process*. Hence states "could not deny the assistance at some stages of the voting process during which assistance was needed . . . ." *Id.*[9]

Indeed, all of the evidence before the Court supports Plaintiffs' broader understanding of the right to vote. For example, in its effort to make meaningful the right to vote for limited-English proficient voters, Section 203, the predecessor to Section 208, required covered jurisdictions to

---

[9] It is a "fundamental principle of the Constitution [] that Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). *See also* U.S. Const. art. VI, cl. 2 (stating that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding").

provide not only translated ballots, but "voting notices, forms, instructions, assistance, or other materials or information relating to the electoral process, including ballots." *Id.* § 10503(c). The VRA defined each of these—the notices, forms, and assistance—as "voting materials." *Id.* §10503(b)(3)(A).

Such a reading is not only consistent with the VRA, it is essential to effecting its purposes. Though Section 208 guarantees assistance for blind, disabled, and otherwise limited-language voters, Defendants have focused their arguments exclusively on the Assistance and Interpretation Provisions as applied to limited-English proficient voters. A wider vantage reveals the weakness of the State Defendants' position. If the Assistance Provisions apply only within the ballot box, and the Interpretation Provisions apply only to limited-English proficient voters, then the State admittedly deprives blind, disabled, and non-language minority limited-English voters of any assistance outside the ballot box. Before blind, disabled, or limited-language voters "enjoy the same opportunity to vote enjoyed by all citizens," voters must, at a minimum, have the capacity to navigate polling stations and communicate with election officers. They must be able to understand and fill out any required forms, and to understand and to answer any questions directed at them by election officers. And they must be able to do so with the assistance of "a person whom [they] trust[] and who cannot intimidate [them]." (S. Rep. 97-417 (1982), available at Dkt. 44-2, at 5).

As a result of the foregoing, the Court has no difficulty in finding that "voting" as referenced in Section 208 includes not only the mechanical reading and marking of a ballot, but all other activities required of voters at a polling place to meaningfully and effectively exercise their right to vote. The Assistance Provisions, insofar as they honor the VRA's requirement of voter choice only at the ballot box, are insufficient to implement Section 208. And the Interpretation Provisions, insofar as they allow an interpreter only if the officer does not speak the same language as the voter and restrict voter choice of interpreter by arbitrarily requiring the interpreter to be registered to vote in the county where assistance is being sought, flatly contradict Section 208. Accordingly, the Texas

Election Code Interpretation Provisions, § 61.031–61.036, restrict voter choice in a manner inconsistent with the Federal Voting Rights Act.

> iii.     *Texas Laws and OCA–Greater Houston*

OCA–Greater Houston seeks to advance "the social, political, and economic well-being of Asian Pacific Americans," (Dkts. 44-11), in particular by promoting civic participation and providing civic education, (*see, e.g.,* 44-12 at 1). One of its core projects is its GOTV initiative, which encourages voting and educates members concerning how to vote. One primary function, which affects the nearly half of Asian-American voters who identify as limited-English proficient and quarter of Asian-American voters who prefer to vote with the assistance of an interpreter, (Dkt. 44-20, at 14), is educating voters concerning their right to an assistor of their choice, and arming them with the knowledge necessary to assert their right.

The Assistance and Interpretation Provisions perceptibly impair OCA–Greater Houston's ability to provide education and assistance to Asian Pacific American voters. Having found those provisions to be invalid, the Court proceeds to afford relief.

## **RELIEF**

Texas Election Code § 61.033 violates and is inconsistent with the provisions of Section 208 of the Voting Rights Act, 52 U.S.C.A. § 10508 (formerly 42 U.S.C.A. § 1973aa-6).

The Court hereby ENJOINS the State Defendants, their employees, agents, and successors in office, and all persons acting in concert with them, from engaging in any practice that denies the rights secured by Section 208 of the Voting Rights Act.

Plaintiff must, within **seven (7) days** of this order, file briefing regarding additional remedies that may be necessary to timely effect necessary relief. Defendants will be given **seven (7) days** to respond.

Finding Plaintiff OCA–Greater Houston to be the "prevailing party" as the Fifth Circuit defines that term,[10] the Court ORDERS that it be compensated "a reasonable attorney's fee, reasonable expert fees, and other reasonable litigation expenses as part of the costs" under 52 U.S.C.A. § 10310 (formerly 42 U.S.C. § 1973l(e)).

### **CONCLUSION**

Defendants' Motion for Summary Judgment (Dkt. 45) is DENIED.

Plaintiffs' Motion for Summary Judgment (Dkt. 44) is GRANTED.

SIGNED on August 12, 2016

_____

ROBERT PITMAN

UNITED STATES DISTRICT JUDGE

---

[10] "The touchstone of the prevailing party inquiry . . . is the material alteration of the legal relationship of the parties in a manner which Congress sought to promote in the fee statute." *Sole v. Wyner*, 551 U.S. 74, 82 (2007); *see also Davis v. Abbott*, 781 F. 3d 207, 213 (5th Cir. 2015).